IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, SDP OF AUSTIN ENTERPRISES, LLC, G. EDWARD ALEXANDER, FRANK SOSSI, and JOHN PRATER,<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br>Civil Action No. A-19-CV-0945 |

## UNITED STATES' COMPLAINT AND JURY DEMAND

For its Complaint against Defendants Lakeway Regional Medical Center, LLC (LRMC), Surgical Development Partners LLC (SDP), SDP of Austin Enterprises LLC (SDP-Austin), G. Edward Alexander, Frank Sossi, and John Prater, the United States alleges as follows:

### INTRODUCTION

1.      The United States brings this civil action to recover for harm sustained by the United States Department of Housing and Urban Development (HUD) resulting from the default by Defendant LRMC on a mortgage loan to LRMC insured by HUD's Federal Housing Administration (FHA), and the misuse of proceeds from that loan by Defendants LRMC, SDP, SDP-Austin, Alexander, Sossi, and Prater.

2.      Acting through its manager SDP-Austin, and SDP's principals and agents Alexander, Prater and Sossi, LRMC applied for and received an FHA-insured mortgage loan,

pursuant to Section 242 of the National Housing Act, 12 U.S.C. § 1715z-7, to fund the construction of a new hospital in Lakeway, Texas.

3.      The failure or success of any new hospital in large part depends on the support from local physicians who will both practice at and refer patients to the hospital.  HUD's review of LRMC's application therefore focused on the level of physician support for the proposed hospital.

4.      Unbeknownst to HUD, Defendants made and conspired to make numerous false statements and material omissions during the application process in order to overstate physician support for the hospital and understate other key credit risks, thereby obtaining FHA insurance under false pretenses.

5.      At the loan closing, physician support for the hospital had eroded, and Defendants were short over $5 million of the approximately $38 million investment equity required by HUD to close the loan.  Rather than inform HUD of these facts, Defendants LRMC, SDP, SDP-Austin, Sossi, Alexander and Prater conspired to cover the shortfall with a number of kiting and kickback schemes.

6.      First, Defendants declined to refund money to physician investors who had cancelled their investments in the hospital.   Instead, Defendants knowingly used more than $1.8 million previously provided by these former investors—essentially borrowing these funds—to fund LRMC's down payment on the FHA-insured loan.  Defendants later reimbursed the investors with the proceeds from the FHA-insured loan.

7.      Second, Defendants made material changes to LRMC's investment structure, without the required HUD approval, in order to secure additional loans from non-physicians to cover the physician shortfall.  In addition to the $1.8 million shortfall described above, certain

physician investors had originally promised to invest in the hospital, but, when given the opportunity to cancel their investments, elected to not contribute $3.7 million in promised funds. LRMC borrowed from non-physician insiders to cover the shortfall. In this way, LRMC and Defendants SDP, SDP-Austin, Alexander, Prater and Sossi concealed from HUD that the level of physician investment, which Defendants knew HUD viewed as a proxy for physician support for the hospital, had dropped, and once again improperly borrowed funds to meet the down payment requirement.

8.      Finally, Defendants LRMC, SDP, SDP-Austin, Alexander, Prater, and Sossi agreed to pay kickbacks to certain insider investors to secure additional investment to cover the shortfall. Sossi, with the agreement of Defendants Alexander and Prater, negotiated "side agreements" with LRMC board members in the days before closing. These side agreements provided that the board members would loan LRMC $1.5 million to close, in return for $900,000 in "fees" for unspecified work to be performed, and for early redemption of purchased notes.

9.      All of these schemes violated HUD's regulatory requirements. HUD would not have allowed closing to occur had it known LRMC could not meet the "cash to close" requirement. LRMC's use of borrowed funds, from investors who had withdrawn their investments and from loans obtained through kickbacks, violated statutory requirements and the express terms of the Regulatory Agreement entered into by LRMC and HUD. As a result of Defendants' scheme, LRMC was insolvent at the time of closing, but that fact was concealed from HUD. Defendants' fraud caused the loan to close and become insured by the FHA.

10.      These misrepresentations went directly to LRMC's ability to successfully open and operate a hospital. Defendants concealed LRMC's insolvency and concealed significant

deterioration in physician support that were material to HUD's evaluation of the credit risk of the hospital.

11.    Defendants' fraud did not stop at closing.  Defendants made numerous improper distributions from restricted LRMC funds in violation of LRMC's Regulatory Agreement, including the kickback fees to board members described above.  LRMC also used funds from the FHA-insured loan to pay for federal lobbying even after HUD informed LRMC that such a payment would violate federal law.

12.    LRMC was built at significant cost but was a failure from the start.  It never operated profitably, defaulting within three months of HUD's Final Endorsement.  Ultimately HUD paid claims for $172 million in connection with the LRMC loan.

## JURISDICTION AND VENUE

13.    This action arises under the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733; the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1833a; the common law theory of negligent misrepresentation; and the Double Damages Remedy, 12 U.S.C. § 1715Z–4A.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

14.    This Court has personal jurisdiction over Defendants because the Defendants can be found in or transact business within the Western District of Texas.

15.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395, and 31 U.S.C. § 3732(a), because LRMC can be found and transacts business within the Western District of Texas and because a substantial part of the events and omissions that give rise to the claims occurred in this district.

## THE PARTIES

16.     Plaintiff is the United States of America.

17.     Defendant LRMC is a Texas limited liability company that previously operated a hospital in Lakeway, Texas.

18.     Defendant SDP is an Ohio limited liability company.  SDP developed and managed the operations of LRMC.

19.     Defendant SDP-Austin is a Texas limited liability company.  SDP acted through SDP-Austin.  The actions of SDP described herein were also the actions of SDP-Austin as the two companies acted interchangeably.

20.     Defendant Alexander is a natural person who resides in the state of Tennessee. Alexander is the Chief Executive Officer (CEO) of SDP and acted as a principal, and served on the board, of LRMC.

21.     Defendant Prater is a natural person who resides in the state of Tennessee.  Prater is the Chief Financial Officer (CFO) of SDP and acted as the CFO of LRMC.

22.     Defendant Sossi is a natural person who resides in the state of Ohio.  Sossi is an attorney who acted at times as an attorney for LRMC and SDP, but also served as a consultant to LRMC and as LRMC's CEO.

## THE FALSE CLAIMS ACT

23.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without

qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

24.     Under the FCA, a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).  The FCA also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).  It further makes liable any person who "conspires to commit a violation of" the sections cited above. *Id.* § 3729(a)(1)(C).

25.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required. *Id.* § 3729(b)(1)(B).

26.     A request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a false "claim" under the FCA.

27.     Any person who violates the FCA "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FIRREA

28.     Congress enacted FIRREA in 1989 to reform the federal banking system.  Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—

established by a preponderance of the evidence—that affect financial institutions and certain government agencies, including HUD.  *See* 12 U.S.C. § 1833a(e).

29.     Two of the predicate offenses that can form the basis of liability under FIRREA are relevant here.  First, 18 U.S.C. § 1006 prohibits any person who is "connected in any capacity with [HUD]" from "mak[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner, or agent . . . of [a] department or agency of the United States."  Second, 18 U.S.C. § 1014 (as amended on July 30, 2008) prohibits any person from "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of [HUD]."

30.     FIRREA generally allows the United States to recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $5 million or $1 million per day, whichever is less.  However, in cases such as this, where the violation results in both a gain to the perpetrator and pecuniary loss to the victim, the United States can recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.

## NEGLIGENT MISREPRESENTATION

31.     The United States may bring common law claims under federal common law.

32.     Under the common law of negligent misrepresentation, the United States can recover damages caused by any person with a pecuniary interest in the transaction who supplies false information upon which the United States justifiably relies.

## DOUBLE DAMAGES REMEDY

33.     The Double Damages Remedy provides a broad remedy to deter anyone from improperly distributing funds from a HUD insured project.  Under the Double Damages

Remedy, the United States may bring an action against any "person" for the "use of assets or income in violation of [a] Regulatory Agreement" with HUD.  12 U.S.C. § 1715z–4a (a). Further, "[f]or purposes of this section, a use of assets or income in violation of the regulatory agreement, or such other form of regulatory control as may be imposed by the Secretary, or any applicable regulation shall include any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the property and has not been maintained in accordance with the requirements of the Secretary and in reasonable condition for proper audit."  *Id.* § 1715z–4a (a)(1).

34.     Liability extends to "any beneficial owner of the property under any business or trust;" "any officer, director, or partner of an entity owning or controlling the property;" "any hospital lessee or operator;" "any other person or entity that controls the property regardless of that person or entity's official relationship to the property; and" "any … agent of any person or entity described in the preceding subparagraphs." 12 U.S.C. § 1715z–4a (a)(2)(B), (C), (F), (G). The United States is entitled to recover "double the value of the assets and income of the property that the court determines to have been used in violation of the Regulatory Agreement[.]"  *Id.* § 1715z–4a (c).

## FACTUAL BACKGROUND

I.    **FHA RELIES ON ACCURATE AND COMPLETE INFORMATION FROM BORROWERS TO DETERMINE THE RISK OF DEFAULT AND DECIDE WHETHER TO INSURE A LOAN.**

   A.    **FHA Offers Mortgage Insurance For Loans That Fund The Construction Of Hospitals.**

35.    HUD is a cabinet-level agency of the United States.  FHA, which is a part of HUD, is one of the largest mortgage insurers in the world.  Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs.

36.    FHA is authorized to provide mortgage insurance for the construction or rehabilitation of acute care hospitals under Section 242 of the National Housing Act, 12 U.S.C. § 1715z-7(a).  The purpose of the loans is to provide greater access to healthcare in communities in need of a hospital, with the aim of reducing healthcare costs incurred by the government by providing better access to medical care.

37.    A lender (often referred to as a mortgagee) who provides the FHA-insured loan to a borrower must be FHA-approved and in compliance with the general FHA requirements in order to participate in the hospital program.  24 C.F.R. § 242.5.

38.    A borrower applies for Section 242 FHA insurance with the help of an FHA-approved lender.  The FHA-approved lender—typically a mortgage broker that arranges the loan but utilizes a larger financial institution to actually fund it— acts as an adviser to the borrower, helping the borrower understand the application process, assemble the necessary information, and answer any inquiries from HUD.  A borrower submits an application for mortgage loan insurance in conjunction with an FHA-approved mortgagee.  The lender provides the mortgage loan to the borrower, and FHA insures the loan against potential loss.

**B.      FHA Implemented A Multi-Stage Application Process To Analyze Potential Borrowers.**

39.      In order to minimize risk of default, and to allow borrowers to avoid significant expense for uninsurable projects, FHA utilizes a multi-step process.  As set forth below, this process includes a preliminary review, a pre-application meeting, an Application, a Firm Commitment, an Initial Endorsement, and a Final Endorsement, which occurs after construction is completed.  At each of these stages, the borrower is required to submit complete and accurate information, and FHA relies on that information to move forward with the underwriting process.

i.      The Preliminary Review and Pre-Application Meeting

40.      The first step in this process is a preliminary review.  The borrower completes FHA's Community Needs Assessment, which allows FHA to determine if there is a demonstrated need for the proposed hospital, as required by the program.  The borrower also provides preliminary financial information to FHA.

41.      FHA's preliminary review enables a preliminary determination of eligibility and feasibility.  If, after this review, FHA determines that the proposed project is desirable, FHA invites the borrower to participate in a pre-application meeting.

42.      At the pre-application meeting, FHA meets with the team proposing the hospital project.  This meeting allows FHA to gather additional information and provides an opportunity for the proposed project team to give FHA a more detailed presentation on the particulars of the proposed hospital.

43.      If FHA determines the project is eligible and feasible, FHA invites the borrower to submit a full application for insurance.

ii.      The Application

44.      The FHA-approved lender assembles the application using information provided

by the borrower and submits the application package to the FHA.  The borrower must provide

detailed information about the proposed hospital in the application to FHA, including

architectural and environmental information, organizational information, and a market study.  24

C.F.R. § 242.16.

45.      The borrower must make the following certification in the application:

The undersigned, as the principal sponsor(s) of the proposed mortgage, certify(ies) that he/she (they) is (are) familiar with the provisions of the regulations of the Secretary of Housing and Urban Development under the above identified section of the National Housing Act and that to the best of his/her (their) knowledge and belief the mortgagor has complied, or will be able to comply, with all of the requirements thereof which are prerequisite to insurance of the mortgage under such Section.

It is hereby represented by the undersigned that to the best of his/her (their) knowledge and belief no information or data contained herein or attachments listed herein are in any way false or incorrect and that they are truly descriptive of the project or property which is intended as the security for the proposed mortgage and that the proposed construction will not violate zoning ordinances or deed restrictions.

HUD Form 92013-OHF.

46.      The borrower must hire an independent feasibility consultant to review the

proposed project and issue a feasibility study that is included in the application.  The feasibility

study reviews the financial outlook for the proposed project, including its anticipated patient

volume, either based upon past performance for rehabilitation loans or projected performance for

new construction loans, anticipated market share, and debt services coverage.  24 C.F.R.

§ 242.16(a)(4).

iii.      FHA Review and Firm Commitment

47.     FHA assigns a Client Service Team to review the application materials provided by the borrower.  In addition, FHA orders its own separate and independent feasibility study.

48.     The FHA-ordered feasibility study is conducted using the information provided by the borrower, the borrower-ordered feasibility study, and any additional information requested by the FHA feasibility consultant and the Client Service Team.

49.     The Client Service Team determines whether the borrower is sufficiently creditworthy and whether the proposed hospital is an acceptable risk to the FHA insurance fund. A recommendation is submitted to a credit committee for concurrence, and if approval is recommended, a report is completed for presentation to the FHA Commissioner to recommend the issuance of a Firm Commitment.  24 C.F.R. § 242.16(f).

50.     In a Firm Commitment, FHA agrees to endorse the mortgage loan for insurance if the lender and borrower are able to satisfy certain conditions.  The conditions include both standard conditions and special conditions tailored to the type of mortgage loan and the particular circumstances of the borrower.  FHA will not agree to close on a mortgage loan and endorse it for insurance if the conditions of the Firm Commitment are not satisfied.  24 C.F.R. § 242.17.

51.     The Firm Commitment requires that "[a]ny change in the Drawings and Specifications or in the conditions upon which this commitment is based, which may occur after the date hereof, shall be explained in writing, or in a supplementary application if required by the [FHA], and must be approved by the [FHA] prior to initial endorsement."  HUD Form 92432 *Commitment for Insurance of Advances* ¶ 3.

iv.      Initial Endorsement

52.      After Firm Commitment, the borrower must satisfy project-specific requirements and work with the lender to schedule a closing on the loan.

53.      FHA is authorized by statute to insure up to 90 percent of the project's replacement cost. 12 U.S.C. § 1715z-7(d)(2).  For this reason, a standard condition for a Section 242 loan Firm Commitment is that the borrower must contribute a 10 percent down payment. HUD also often requires escrowed funds, in addition to the down payment, to ensure the borrower has a sufficient capital cushion to achieve profitability.  The down payment and escrow funds must come from the borrower's equity and generally cannot be borrowed.  These equity funds are often referred to as "cash to close."

54.      FHA provides an Initial Endorsement at the mortgage loan closing that allows for the first release of mortgage funds.

55.      The borrower makes numerous certifications at closing.  Those certifications include "that the fees and expenses enumerated in the Mortgagee's Certificate have been fully paid or payment provided for as set forth therein, and that the funds deposited with the Mortgagee, as enumerated in the said Mortgagee's Certificate will be used for the purposes indicated therein."  HUD Form 92433 *Mortgagor's Certificate* ¶10.  The borrower further certifies "that the undersigned has no obligations except those approved by HUD."  *Id.* ¶13.  The lender (Mortgagee) certifies the amount of cash to close received from the borrower.  The borrower further certifies that it "has complied with and not violated the provisions of the Commitment[.]"  HUD Certificate.

v.      Final Endorsement

56.     As the construction proceeds, the borrower applies for the release of additional mortgage funds.  The lender then applies to the FHA for insurance of these advances until the construction is completed.

57.     At the close of construction, the lender applies for a Final Endorsement of the note, which occurs at a second closing for the project.  After this second closing, the hospital is deemed to be operational and is monitored by FHA's asset management staff.

vi.     Default and Claim

58.     If the borrower defaults, the holder of the mortgage may submit a claim to HUD for any loss from the default.  HUD pays the mortgage holder the outstanding balance on the loan and other costs associated with the default, thereby minimizing loss when a borrower is unable to repay an FHA-insured mortgage.  HUD pays these insurance claims in two parts.  First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest. After processing, HUD approves the initial claim for payment, and sends a disbursement request to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.  Second, the mortgage holder makes a second claim for expenses and allowances plus interest, and HUD pays the remaining balance of the claims.

59.     The holder of the note then transfers the property to HUD, if the mortgage was foreclosed on, or the note, if there was no foreclosure.  HUD sells the property or the note, often through an auction, and recoups some of the losses.

**C.     Borrowers Must Comply With The Requirements Of The Regulatory Agreement.**

60.     In addition to the requirements discussed above, the Firm Commitment is also conditioned upon the execution of a Regulatory Agreement by the borrower at the Initial

Endorsement.  The Regulatory Agreement provides the means by which FHA can regulate the borrower and its use of the collateral securing the mortgage loan. 12 U.S.C. § 1715z-7(d)(1); 24 C.F.R. § 242.56.

61.     In order to protect HUD, the borrower is required to agree that any property, including current and future cash, of the insured project is subject to the restrictions of the Regulatory Agreement:

> As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property … Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

HUD Form 92466 ¶ 12.

62.     The borrower agrees to keep the project in good repair, operate the project according to its approved purpose, and to not "[a]ssign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs."  HUD Form 92466 ¶ 6(b).  The Regulatory Agreement prohibits the borrower from making distributions to owners except from Surplus Cash and in accordance with the procedures dictated by the agreement.

63.     Surplus Cash is defined by the Regulatory Agreement as cash remaining after the project has satisfied its various obligations under the Regulatory Agreement.  FHA sometimes also includes a Rider to the Regulatory Agreement with a project-specific definition of Surplus Cash.  HUD Form 92466 ¶ 13(f).

64. The Regulatory Agreement provides for serious consequences if it is violated. Upon notice of a default under the Regulatory Agreement, HUD may request that the mortgage be declared in default, collect the rents of the property to make any payments required by the Regulatory Agreement, or take possession of the project. The remedies under the agreement are in addition to other remedies at law available to HUD.

## II. DEFENDANTS MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS TO HUD AND FRAUDULENTLY INDUCED FHA TO ENTER INTO THE FIRM COMMITMENT.

### A. LRMC Submitted An Initial Application For An FHA-Insured Mortgage Loan In September 2009.

65. In 2006, Dr. Sam DeMaio and Dr. Thomas Baldacchino, two Austin-area cardiologists; Dan Brouillette, a real estate investor who owned the land on which LRMC would be built; and others began working to build a new for-profit acute care hospital in Lakeway, Texas. They sought to develop LRMC into a physician-owned and physician-managed hospital where the physicians who practiced at the hospital would share in the profits and have significant control over hospital operations.

66. In February 2008, the initial development group hired SDP to help develop and manage the hospital. SDP helped form LRMC on or about March 7, 2008. LRMC agreed to a monthly pre-opening fee of $55,000 that SDP would receive only if LRMC successfully raised the funds to build the hospital. Upon opening of the hospital, LRMC agreed to pay SDP five percent of LRMC's net revenue, capped at $1.2 million the first year, $800,000 the second year, $480,000 the third and fourth years, and $360,000 every year after. SDP obtained a seat on LRMC's board of directors and appointed Defendant Alexander to that seat. Alexander later became a member of LRMC and acted as the managing member of LRMC. Defendant Prater served as LRMC's chief financial officer (CFO).

- 16 -

67.     In April 2008, LRMC issued a Private Placement Memorandum (PPM) in order to recruit investors, primarily physician investors.   From the beginning, physician support was considered key to the success of the project.  Without sufficient physician referrals and staff, the hospital would fail.

68.     LRMC originally planned to finance the project through financing from a real estate investment trust.  However, it was unsuccessful in obtaining this financing.  Around February 2009, LRMC began to pursue an FHA-insured Section 242 loan.

69.     In April 2009, LRMC hired Column Guarantee as an advisor and mortgage broker for an FHA insured mortgage under the FHA Section 242 Mortgage Insurance Program.  While the application was pending, Walker & Dunlop (W&D) purchased Column Guarantee.  The Complaint uses the term "W&D" to refer to both W&D and Column Guarantee.

70.     LRMC met with HUD on June 3, 2009 for a pre-application meeting.  During that meeting, LRMC emphasized the strength of the project, in part through highlighting the 86 physician investors that it had recruited to invest more than $18 million in the project and practice at the hospital.  Some of these investments were in the form of promissory notes, not cash, as the physicians agreed to contribute when LRMC obtained financing.  Defendants Alexander, Sossi, and Prater attended the meeting.  As a result of that meeting, LRMC was invited to apply for FHA Section 242 insurance.

71.     Later in June 2009, SDP recruited Pacific Medical Buildings (PMB) to recruit an investment group for a major investment—approximately $20,000,000—in LRMC and develop an adjacent medical office building.  PMB specialized in developing medical office buildings.  Brad Daniel and Jeff Rush were the primary individuals responsible for recruiting the PMB investment group.

72.     LRMC created six classes of investment: A, B, C, D, E, and F.  Class A was for the original founding members.  Class B was made up of physician investors and community investors, with physician investors specifically defined as physicians in a position to refer patients to the hospital.  Class C was limited to SDP.  Class D was for non-voting investors if the other classes were fully subscribed.  Classes E and F provided preferred returns to the PMB investors.

73.     In September 2009, LRMC, through W&D, submitted an application for FHA insurance.  Part of that application was a financial feasibility study performed by Crowe Horwath for LRMC.  That study looked at the project's proposed financial statement and the potential demand for a hospital in the Lakeway area to determine that the hospital was financially feasible.

74.     Part of the feasibility study looked at LRMC's prospective medical staff.  The study specifically stated that "LRMC's medical staff will largely consist of investors in the Hospital" and provided the following list of "investors by specialty:"

| Medicine | Number of Physicians |
|---|---|
| Allergy | 1 |
| Anesthesiology | 1 |
| Cardiology | 5 |
| Endocrinology | 1 |
| Emergency medicine | 1 |
| Infectious disease | 1 |
| Neurology | 1 |
| Obstectrics/Gyncologists | 4 |
| Pediatrics | 10 |
| Physical/Spine physician | 1 |
| Primary care physicians | 5 |
| Pulmonology/ Critical care | 1 |
| Total Medicine | 32 |
| **Surgery** | |
| Cardiovascular surgery | 2 |
| General surgery | 12 |
| Otolaryngology | 4 |
| Oncologists | 2 |
| Orthopedic surgery | 5 |
| Spine Surgery | 2 |
| Urology | 2 |
| Total Surgery | 29 |
| **Other** | |
| Hospitalists | 3 |
| Pathology | 15 |
| Radiology | 6 |
| Total Other | 24 |
| **Total All Specialties** | 85 |

75.     The study went on to state that LRMC's financial forecasts were based on a survey of the identified physician investors' patient volume, predicated on the assumption that 60 percent of the physicians' patient volume would move to LRMC. The study—relying on information provided by SDP on behalf of LRMC—specifically stated that "all physician investors will be on the active medical staff[.]"

76.     The report indicated these numbers were a conservative reflection of physician ties to the hospital: "LRMC medical staff will not be limited to investors only. Other community physicians who desire to participate on the medical staff will go through a standard credentialing process. Due to the uncertainty of the number of additional physicians who might choose to participate on the medical staff, management did not forecast any additional volume to be added

from non investor physicians."  The information was provided by Defendants Alexander, Prater, and Sossi and individuals working at their direction.

77.     The application also included HUD's required form 92013.  Defendant Alexander signed the certification quoted in paragraph 45 above as the Manager and Member of LRMC.

**B.     Defendants Misrepresented Physician Support For The Project.**

78.     HUD conducted an on-site review of LRMC in September 2009 after LRMC submitted its official application.  HUD's feasibility consultant, NIS Solutions, also attended the review.   HUD's evaluation focused on whether the hospital would be able to attract enough physicians, and physician referrals, to succeed.  In order to evaluate this, HUD focused on the number and type of physician investors, as well as the demand for and availability of medical office building space.

i.     Defendants Misrepresented the Number of Physician Investors

79.     During the on-site review, in response to HUD's evaluation of the number of physician investors, Dr. DeMaio disclosed that LRMC had obtained additional physician investors beyond the 85 listed in the financial feasibility study submitted with LRMC's application.

80.     On October 5, 2009, Robert Deen, the account executive at HUD in charge of underwriting the LRMC proposal, asked for the identity and specialty of the additional physician investors who planned to be on the medical staff.  On October 6, at Defendant Sossi's direction, Jennifer Kitchens, an SDP employee working on the LRMC proposal, emailed W&D a list of 102 physician investors, identifying 17 new physician investors.  W&D promptly forwarded Kitchen's email to Deen and others, including Defendants Alexander and Sossi.

81.     Defendants' representations regarding physician support for the hospital were not true.  The 17 additional investors were *considering* investing at the time, but ultimately decided

not to invest.  Defendants never informed HUD that these individuals had not yet invested and ultimately did not actually invest in LRMC.  Accordingly, as Defendant Alexander acknowledged in sworn testimony: "[T]here was no reason why [Deen] would not have believed at that point" that there were 102 physician investors who planned to be on the medical staff.

82.     At the same time, some of the original 85 physician investors were leaving the investment.  LRMC issued an amended PPM on October 9, 2009, to conform with certain HUD funding requirements.  LRMC had to provide investors the opportunity to withdraw their investment—and investors did.  Dr. Kurt Von Rueden, Dr. Babu Reddy, and Dr. David Jones all elected to withdraw their investments from LRMC.

83.     Defendants knew that these physicians had withdrawn their investments from the project, but did not inform HUD.

ii.     Defendants Did Not Disclose Exclusivity Agreements Between LRMC and Physician Practices.

84.     Defendants also never informed HUD that, due to lack of demand among physicians for LRMC's investment offerings, Defendants were offering potentially lucrative exclusivity agreements in exchange for the investments.  Defendant Sossi negotiated these "side agreements" to the investment documents, which provided a physician practice the exclusive right to any unassigned patient in the hospital that required the services the practice offered.  For example, in exchange for an investment of $400,000 and the lease of 3,000 square feet of medical office space, one physician, through his practice, was promised the "right to designate the Chairperson of the Pulmonary and Critical Care Department at LRMC and to determine those qualified physicians who will have privileges at LRMC and be the exclusive providers of all inpatient and outpatient pulmonary and critical care services for the patients of LRMC[.]"  This side agreement was drafted by Defendant Sossi, and an updated May 17, 2011 version was

signed by Defendant Alexander.  That physician did, in fact, seek to use his side agreement to exclude other physicians, writing to Sossi in March 2012, before the hospital opened, that "I've been hearing about other pulmonologists here in Austin who are now interested in providing some form of coverage at LRMC.  According to my exclusivity agreement, any potential pulmonologist/intensivist can only gain privileges if they're part of my group."  Sossi responded, agreeing that the physician's "Side Letter allows you the right 'to reasonably determine those clinically qualified physicians who shall have privileges at LRMC in the areas of pulmonology and critical care practice.'"

85.     While exclusivity agreements are sometimes used in hospital-based practices, such as anesthesiologists or emergency room doctors, they present risks to physician recruitment for non-hospital based practices.  Specifically, these arrangements can discourage other physicians with that same specialty from utilizing the hospital, allow the exclusive practice outsized influence in negotiating payments with the hospital, and create risk for the hospital in finding replacement doctors if the exclusive practice is ultimately unable to handle the patient volume.

86.     Defendants never disclosed to HUD the existence of or their intent to enter into exclusivity agreements, or that they were offering non-disclosed incentives, such as exclusivity, in exchange for the physician investments they were touting to HUD as proof of demand for the hospital.  Because of Defendants' omissions, HUD was unable to accurately assess physician demand, and was unaware of the risks to physician recruitment or the viability of the hospital created by the exclusivity agreements.

iii.     Defendants Failed to Disclose Concerns With the Viability of the
         Development of Medical Office Buildings Surrounding LRMC.

87.     As HUD evaluated the project, another area of significant concern was the

development of the site surrounding LRMC—in particular, the three planned medical office

buildings.  The plans, as presented to HUD in the application, called for the development of three

medical office buildings on that site to house the practices of physicians who intended to practice

at the hospital.  HUD viewed the viability of the medical office buildings as a proxy for the

viability of LRMC because a fully functioning and profitable hospital the size of LRMC would

require medical office space to support the anticipated physician practices.

88.     HUD specifically requested information on October 30, 2009.  Deen emailed Jeff

Jones, Vice President with W&D and W&D's account executive for LRMC, identifying the issue

that "the development of all 53+ acres of the Lakeway site on a schedule that parallels the

hospital's feasibility study projected growth **is** really important to the Hospital's success, but the

hospital has no financial control over anything but their 8+ acre parcel of land."  (Emphasis on

"is" in original.)  Deen asked for additional information and stated, "[A]ny evidence of financial

commitment by Pacific Medical Buildings or others to build medical office buildings and lease

to physician's [sic] who will practice/refer to the hospital on a schedule that parallels the hospital

volumes of admissions and referrals in the feasibility study will be of great help.  The same

evidence of financial commitment for the day-care center, retail, and hotel space will be helpful."

89.     Jones forwarded the inquiry along to LRMC.  On November 2, Defendant Sossi

directed Jones to respond that "the 53 acre site is scheduled to include: (i) Hospital;

(ii) Retail/Office; (iii) MOB's [medical office buildings] 1 and 2; (iv) Hotel; and (v) Day Care.

The Hospital tract has been set up to include the Hospital, the garage and if needed an MOB.

These are all controlled by LRMC.  PMB has control of the Retail/Office which would cover any

immediate MOB needs.  The other parts will be driven by the development of the hospital."  He also told Jones to tell HUD that "PMB is also negotiating for the 2nd MOB location.  That discussion is still in process based on feasibility."  W&D, on behalf of LRMC, verbally communicated this in sum and substance to HUD.

90.     On November 3, Jim Rohan, Senior Vice President for Development for PMB, wrote to Defendant Alexander, Defendant Sossi, and others, stating, "[T]o date we have not aggressively marketed the MOB II/III site, because we don't control them."  He went on to note "a key element of viability of the MOB II/III site that arose only last week[,]" explaining that the project would only work financially with paid parking.  He then stated, "[W]ith this potential change in the economic picture, we may be closer to viability on MOB II/III than it appeared.  I do still believe that 190,000 SF is too much building as an initial effort, but if we could justify paid parking and cut the site in half, we may be able to make this work."  Rohan was always concerned about the viability of the MOB and that development of MOB 2 and 3 were always speculative and in fact never occurred.  Defendants never communicated these concerns about the viability of MOB 2 and 3 to HUD.

91.     In fact, the demand for office space was so lacking that Defendants entered into side deals with physicians guaranteeing that PMB would not lease space in the MOB to a competing physician or practice, in exchange for the physicians investing in LRMC and leasing a set amount of space in the MOB.  In at least one instance, a physician was required to lease more space than required by his practice in order to obtain the exclusivity that he sought.  Physician demand never materialized even for one MOB; LRMC ultimately leased much of the building for its own use.

92.     Defendants never shared concerns regarding the lack of demand for an MOB, or the lack viability of the development of the MOB 2 and 3 sites with HUD.  These sites were not in fact developed in part because there was never sufficient demand from physicians to make them viable and necessary.

**C.      HUD Based Its Approval In Part On These Material Misrepresentations And Omissions.**

93.     The above misrepresentations and omissions all occurred as HUD was considering whether to recommend approval of the Firm Commitment.

94.     In addition to the evaluation by the Client Service Team, HUD hired its own independent feasibility consultant to check the work and conclusions of the borrower's feasibility consultant.

95.     HUD's feasibility consultant issued its report on October 8, 2009, the day after receiving the disclosure from LRMC about the increased physician support.  That report identified as key credit strengths that the "equity investment by physicians, projected to be on medical staff, of $13.6 million ($9.1 million already paid) shows strong commitment."  It further noted that LRMC has "a diverse recruited medical staff of 102 physicians with an average age of 43."  The report noted as the primary credit weakness that "as a start-up hospital, the ability to recruit physicians, staff, and patients will be difficult."  Due to Defendants' misrepresentations and omissions, the information upon which the HUD feasibility consultant relied was false; in fact, LRMC did not successfully recruit the additional 17 physician investors included in the consultants tally and had already lost 3 investors—each of whom had demanded a refund of their investments.

96.     On February 25, 2010, at the recommendation of HUD's staff, FHA Commissioner David Stevens approved the project and authorized the Firm Commitment for a

$166,872,800 mortgage loan.  That approval was based in part on information from Defendants that "currently, there are 102 physicians who have collectively invested over $18,500,000 (with approximately $17 million being surplus cash notes)."   The HUD staff recommendation cited these figures and states, in pertinent part: "Conservative Volume Projections.  The financial feasibility study is significantly conservative in terms of demand for services.  The method used to determine volumes took 60 percent of the volumes of 85 investor physicians into consideration.  No volume assumptions were made for non-investors physicians or physicians who will invest later.  Currently, the number of physician investors has grown to 102.  It is predicted that an additional 20 to 30 physicians will invest in the project[;]" and that "the hospital will be highly visible and surrounded by numerous commercial businesses and MOBs."

97.     The approval was also based on the mitigation of key risks including the following: "More primary care physicians are needed.  The physician investor group is heavy with hospital-based physicians, such as pathologists and radiologists who do not admit patients, and light on primary care physicians who do refer patients for admission."  Another noted risk was "Medical Office Buildings (MOBs) Development Is Not Within LRMC's Control.  Pacific Medical Buildings is responsible for developing the MOBs elsewhere on the 53 acre site, but is not required to meet any deadlines important to LRMC's development and won't close on a land purchase until HUD issues a mortgage insurance commitment on the hospital project."

98.     The strengths that counseled in favor of insuring the mortgage, noted in paragraph 96, were overstated, due to omissions and misrepresentations by Defendants, and the risks that counseled against insuring the mortgage, noted in paragraph 97, were exacerbated by the facts Defendants misstated and hid from HUD.  These misstated and undisclosed facts included that additional physicians had not invested, physicians had already withdrawn their investments,

PMB was actively questioning the viability of the MOBs and at a minimum planned to downsize them, and LRMC had negotiated and planned to continue to negotiate exclusivity agreements, as an undisclosed incentive to invest and to lease space, with physicians who could refer patients to the hospital thereby discouraging other primary care physicians from using LRMC.

99.     At the same time HUD was considering whether to issue a Firm Commitment, Congress was finalizing the passage of the Affordable Care Act (ACA).  Part of the proposed legislation, which ultimately was enacted, repealed an exception to the physician self-referral law (commonly referred to as the "Stark Law"), thus changing the rules surrounding a hospital's ability to bill Medicare for services referred by physicians with an equity interest in the hospital. HUD was concerned that if Congress passed the ACA, as it eventually did, LRMC, as a physician-owned hospital, would be ineligible to bill Medicare, and therefore would not be economically viable.  Accordingly, HUD was unwilling to approve the project as structured.

100.     LRMC proposed converting the physicians' equity interests to debt positions subordinate to any FHA-insured mortgage.  LRMC represented to HUD that this debt position met the amended requirements of the Stark Law.  LRMC called this debt "Surplus Cash Notes." These Notes would not receive any payments of principal or interest until LRMC was operating profitably and thereby generating surplus cash.

101.     After numerous discussions both with LRMC and internally with HUD staff, on January 22, 2010, Deen communicated to W&D that HUD staff had recommended moving forward to Firm Commitment on the LRMC project "based on physician equity being converted to surplus cash notes prior to initial endorsement.  The first condition indicates that we want to see the documents that facilitate those conversions prior to the FHA Commissioner's

Commitment so that we know that such conversions are in progress and will be completed before initial endorsement."

102.     As part of the discussions that led to FHA's approval of the change to Surplus Cash Notes, W&D, after consulting with LRMC, communicated to HUD that after receiving Firm Commitment, LRMC would "receive appropriate sign off from all investors."

103.     To formalize LRMC's representations regarding the conversion of physicians from an equity to a debt position, on February 23, 2010, Defendant Alexander, on behalf of LRMC, wrote to Roger Miller, the Director of HUD's Office of Insured Healthcare Facilities: "We are writing this letter to the Department of Housing and Urban Development ('HUD') to confirm that Lakeway Regional Medical Center (the 'Hospital') has agreed to the conversion of the Physician held Class A and Class B Common Interests in the Hospital to Surplus Cash Notes to be held by those Physicians in the amount of approximately Seventeen Million Dollars ($17,000,000).  The Hospital is in the process of documenting the conversion through the issuance of a Third Addendum to the Hospital's Confidential Private Placement Memorandum and the issuance of the Surplus Cash Notes in the form as approved by HUD.  This conversion will be completed by the Hospital and the affected Physicians prior to Initial Endorsement."

104.     FHA issued the Firm Commitment to insure the loan on March 18, 2010.

III.    **LRMC FAILED TO SATISFY THE CONDITIONS REQUIRED TO CLOSE THE LOAN AND RECEIVE THE INITIAL ENDORSEMENT FOR FHA INSURANCE.**

105.     LRMC, W&D, and HUD scheduled the loan closing for May 21, 2010.  LRMC had to meet the requirements of the Firm Commitment, including converting physician investors to Surplus Cash Note holders and obtaining all of the funds necessary to meet the cash to close requirements before the loan closing in order for HUD to endorse the loan at closing.

106.    The Firm Commitment specifically contained the requirement that LRMC provide $18,541,479 in "cash equity," the statutorily required equity down payment, and a $20,218,009 "Initial Operating Capital Fund."  HUD required that "the [Initial Operating Capital Fund] account must be funded at initial endorsement" and "the Mortgagor [LRMC] may not use borrowed funds, except those funds received by Mortgagor from the Surplus Cash Notes issued by Mortgagor in an amount not to exceed eighteen million dollars ($18,000,000) prior to initial endorsement, to establish the fund."  The Firm Commitment further contained in Exhibit A an organization chart provided by LRMC that identified the holders of Surplus Cash Notes as from "former class A & B physicians."  As stated above, Class A & B physicians were represented by LRMC to be physicians who were original founding members and other physicians who intended to practice at LRMC.

107.    The Firm Commitment also contained the requirement, detailed in paragraphs 50 and 51 above, that LRMC explain in writing any change to the conditions on which Firm Commitment was granted and receive HUD approval prior to Initial Endorsement.

108.    In order to convert physician investors to Surplus Cash Note holders, as LRMC promised HUD, LRMC issued a third Addendum to the PPM on March 30, 2010.

109.    The notice allowed investors to cancel and forfeit any equity investment in LRMC: "Right to Cancel.  The Company hereby offers each Electing Investor the right to cancel such Electing Investor's subscription to invest in the Company for a period of thirty (30) days following the date of this Third Addendum in accordance with the procedures set forth in paragraph 5 below.  Please be aware that if you are an Electing Investor and you elect to cancel your subscription to invest in the Company, then you have no rights or provisions with respect to

the Company including, without limitation, any rights to participate in any profits realized by the Company."

### A.   Given The Opportunity, Physicians Diminished And Canceled Their Investments.

110.   Both Defendants and W&D recognized the risk that physicians might withdraw. On April 13, 2010, Jones emailed Defendants Sossi and Alexander asking, "[H]as there been any resistance from the docs to this point?"  Alexander responded, "[V]ery little so far.  Frank and Joel [Canfield] have handled the few negative comments with positive results."  Jones responded, "[E]xcellent."

111.   In fact, physicians were resistant to the new deal.  Only a week after this email exchange, LRMC began to assess the physicians' withdrawal from the hospital.  Joel Canfield, LRMC's first employee, compiled a list of the physicians who were withdrawing their investments.  He specifically noted LRMC's internal accounting included the physicians who had withdrawn prior to Firm Commitment, stating: "[I]ncluded in this list are the other MD's who dropped out between the Second and Third Amendment[.]"

112.    Below is LRMC's internal accounting by practice of the physician withdrawals as of April 28, 2010:

| | | | | | | |
|---|---|---|---|---|---|---|
| Alergists | 1 | 1 | Oncologists | 2 | 1 | |
| Anesthesiologists | 1 | 1 | Orthopedic Surgeons | 5 | 3 | |
| Cardiologists | 5 | 5 | Pathologists | 15 | 15 | |
| Cardiovascular Surgeons | 2 | 2 | Pediatricians | 10 | 10 | |
| Endocrinologists | 1 | 1 | Physical/Spine Physician | 1 | 0 | |
| Otolaryngologists | 4 | 1 | Primary Care Physicians | 5 | 3 | |
| Emergency Room Physicians | 1 | 1 | Pulmonologists/Critical Care | 1 | 1 | |
| General Surgeons | 12 | 12 | Radiologists | 6 | 6 | |
| Hospitalists | 3 | 3 | Registered Nurses | 1 | 1 | |
| Infectious Disease Physicians | 1 | 1 | Spine Surgeons | 2 | 1 | |
| Neurologists | 1 | 1 | Urologists | 2 | 2 | |
| Obstetrics/Gynecologists | 4 | 4 | Total | 86 | 76 | 88.4% |
| | | | | | | |
| | | | | | | |

From the 85 physicians that LRMC claimed had invested in its application, and the 102 that it later claimed and that HUD relied on to issue the Firm Commitment, the number had dropped to 76 shortly before the scheduled close of the loan.

113.    Although they were aware of these facts, Defendants did not disclose them to HUD or W&D.  Nor did they disclose that the types of physicians who withdrew were primarily physicians who refer patients—otolaryngologists, oncologists, orthopedic surgeons, physical/spine physicians, and primary care physicians—i.e., the types of physicians that HUD cared most about when considering the feasibility of a new hospital.  Defendant Alexander acknowledged in sworn testimony that he understood physician support, particularly the number of physicians, was important to HUD.

114.    In addition to physicians who withdrew entirely from the transaction, numerous physicians significantly diminished their investments.  Internally, Defendants recognized that this reduction in investment potentially jeopardized closing.  Defendant Alexander wrote on

April 27, 2010, that "we will be short of the HUD [equity] requirement and we need to know by how much today."  On Monday, May 17, 2010, Kitchens circulated to Defendants Alexander and Prater the following reconciliation of physicians' investment amounts that showed a $3,925,000 loss in investments:

| | Additional Value | Cancellation Value | Reduction Value | |
|---|---|---|---|---|
| B&E Holdings | | | $ 800,000.00 | |
| Musculoskeletal | $ 100,000.00 | | $ 1,000,000.00 | |
| B Six | | | $ 400,000.00 | |
| Jones | | $ 400,000.00 | | |
| Gambarin | | | $ 250,000.00 | |
| VonRueden | | $ 200,000.00 | | |
| MCS/620 | | | $ 400,000.00 | |
| Moroz | | $ 50,000.00 | | |
| LRMC Investments | | | $ 600,000.00 | |
| Frischhertz | | | $ 75,000.00 | |
| Wasserman | $ 25,000.00 | | | |
| Reddy | | $ 200,000.00 | | |
| Dang | | | $ 25,000.00 | |
| DeWitt | | $ 25,000.00 | | |
| Freeland | | | $ 75,000.00 | |
| Jayawant | | | $ 50,000.00 | |
| ED Group | $ 500,000.00 | | | |
| | $ 625,000.00 | $ 875,000.00 | $ 3,675,000.00 | $ (3,925,000.00) |

The reduction was actually $4,425,000.00, as the ED Group (referenced above) did not invest the $500,000 listed on the reconciliation.

**B.     LRMC Did Not Meet The Cash To Close Requirements.**

115.     Closing was scheduled for Friday, May 21, 2010, a mere four days after Defendants Alexander and Prater received the reconciliation described above.  LRMC needed over $38 million to close the loan based on HUD's requirement in the Firm Commitment. Internally, LRMC distributed a cash reconciliation on May 17, 2010, to discuss the current cash shortfall.  The reconciliation, sent to Alexander and Prater, showed a cash shortfall of $4.6 million, not including an additional $877,000 due from investors who had not yet funded their investments.  At least $500,000 of the unfunded investments were cancelled, so, in the aggregate,

LRMC actually had at least a $5.1 million cash shortfall:

| Lakeway Regional Medical Center | | |
|---|---|---|
| **Cash Reconciliation** | | |
| | | |
| Cash, Operating Account | $ 1,714,690.84 | |
| Cash, Escrow | $ 691,076.45 | |
| Cash, Escrow - PMB | $20,000,000.00 | |
| Cash, Heritage First | $ 250,515.50 | |
| Cash, Cornerstone Bank | $ 250,560.89 | |
| Prepaids on Draw #1 | $11,974,849.06 | |
| Total Cash Available for Closing Before Refunds & Collection of Notes | | $ 34,881,692.74 |
| | | |
| Prepaids on Draw #2 | $ 127,398.90 | |
| Note Payment to be Received, Roden/Musculoskeletal Provider Trust | $ 100,000.00 | |
| Note Payment to be Received, ED Group | $ 500,000.00 | |
| Note Payment to be Received, Nogbie | $ 50,000.00 | |
| Note Payment to be Received, Fredberg | $ 100,000.00 | |
| Total Prepaids on Draw #2 and Outstanding Notes | | $ 877,398.90 |
| | | |
| Total Cash Available for Closing Before Refunds Including Draw #2 & Collection of N | | $ 35,759,091.64 |
| | | |
| Reimbursement of Investment, Gambarin | $ (250,000.00) | |
| Reimbursement of Investment, B&E Holdings | $ (300,000.00) | |
| Reimbursement of Investment, Moroz | $ (50,000.00) | |
| Reimbursement of Investment, 620/CMS | $ (285,714.28) | |
| Reimbursement of Investment, Reddy | $ (33,000.00) | |
| Reimbursement of Investment, LRMC Investments | $ (600,000.00) | |
| Reimbursement of Investment, Lakeway TX Investments | $ (50,000.00) | |
| Due to Investors, at Close - Holdback Amounts | $ (62,552.88) | |
| | | |
| Less:  Refunds To be Paid | | $ (1,631,267.16) |
| | | |
| Net Projected Cash Available | | $ 34,127,824.48 |
| | | |
| | | |
| HUD Requirement, per HUD Form 2013 | | $ 38,759,488.00 |
| | | |
| Variance | | $ (4,631,663.52) |
| | | |
| | | |
| Variance if Notes are not collected | | $ (5,381,663.52) |

116.   LRMC's board met on conference calls on May 14 and May 18, 2010.  According to the board meeting minutes, "both calls were scheduled to review HUD closing status and the funding deficit that needed to be bridged to close."  The board recognized that as of May 13, 2010, LRMC was "approximately $4 million short on a cash needs basis to close for HUD."  The Board agreed to engage in three fraudulent practices in order to deceive HUD and W&D to close and insure the loan: (1) until after closing, LRMC would not refund investors who had paid for

their investments but subsequently withdrew, thereby kiting the funds to use them as cash to close; (2) LRMC would pay two board members, Brad Daniel and Jeff Rush, kickbacks for Daniel and Rush to collectively loan LRMC $1.5 million; and (3) LRMC would change its structure, without HUD approval, to allow non-physicians to purchase Surplus Cash Notes, which would allow LRMC to borrow funds from non-investors through Surplus Cash Notes to meet the cash to close requirement.

i.     <u>LRMC Used Withdrawn Investors' Funds as Cash to Close.</u>

117.     As noted above, in order to appear to meet the cash to close requirement, in part, Defendants used the funds from investors who had withdrawn their investment but who had not yet received refunds—essentially borrowing or kiting those funds. At closing, LRMC had an undisclosed liability to the withdrawn investors but did not have sufficient cash to cover the liability.

118.     On May 17, 2010, Defendant Prater emailed Defendants Sossi and Alexander regarding the cash reconciliation in paragraph 115 above:

| To: | Frank T. Sossi[ftsossi@bmdllc.com]; Edward Alexander[ealexander@surgicaldevelopmentpartners.com] |
|---|---|
| Cc: | Jennifer Kitchens[jkitchens@surgicaldevelopmentpartners.com]; John Prater[jprater@surgicaldevelopmentpartners.com] |
| From: | John Prater |
| Sent: | 2010-05-17T10:11:34-06:00 |
| Importance: | Normal |
| Subject: | Cash Reconciliation - LRMC Summary 05172010.xls |
| Received: | 2010-05-17T10:11:34-06:00 |

Cash Reconciliation - LRMC Summary 05172010.xls


Frank,

LRMC Cash recon as of today attached.  With the $4 million coming from Catlyn we have enough to close with HUD.  With regards to the refunds back to the physicians of $1.6 million, we need to collect on the $750,000 from the notes outstanding and we will have roughly $250,000 from the balance of reimbursements of prepaids from draws.  This leaves us about $631,000 short.

Eddie mentioned that Sam raised $300,000 in class D's on Saturday.

I will call you to review.

Thanks, JP

Prater recognized that the refunds would be funded in part from HUD funds after closing through

"the balance of reimbursements of prepaids from draws[.]"   But, even using the HUD funds,

LRMC remained "$631,000 short" of the cash needed to reimburse withdrawn investors.

119.    The Firm Commitment prohibited LRMC from using borrowed funds as cash to

close.  The Firm Commitment contained the specific prohibition that "Prior to initial closing, the

Mortgagor shall not without the permission of HUD, unless permitted under the proposed loan

covenants and HUD is informed of such action in writing: […] (4) incur any debt or obligation

other than trade payables in the ordinary course of business; […] Any actions that the Mortgagor

has already taken that conflict with this condition shall be fully explained to HUD's satisfaction

prior to initial closing."  The refunds owed to withdrawn physician investors were not "trade

payables in the ordinary course of business[,]" were not "permitted under the proposed loan

covenants" or disclosed to HUD "in writing[,]" and were not "fully explained to HUD's

satisfaction prior to initial closing."  Indeed, Defendants never once informed HUD that they

planned to use these withdrawn funds in this manner.

120.    Defendant Alexander, on behalf of LRMC, signed the certifications in paragraph 55 above that LRMC had the cash to close, did not have any undisclosed obligations, and complied with the provisions of the Firm Commitment, none of which were true.

ii.     <u>LRMC Paid Kickbacks to Secure Investments</u>

121.    At the same board meetings discussed in paragraph 116 above, the Defendants also agreed to pay kickbacks to two investors to fill a portion of the funding gap.  As reflected in the minutes, the board agreed "to go forward with the Side Letters to RD and Jeff Rush … to fill the funding gaps."  RD refers to RD Development Partners, LLC, a company controlled by Brad Daniel, an LRMC board member.  Jeff Rush was also a board member of LRMC.  The side letters provided that, in exchange for their purchase of $1.5 million in Surplus Cash Notes, Jeff Rush and RD would receive $1,400,000 in fees from LRMC, $500,000 of which would be paid as additional Surplus Cash Notes.

122.    Defendants never disclosed these fees to HUD.

123.    Instead, these agreements were done through side letters in order to conceal the arrangement from HUD.  Four days before closing, Defendant Sossi sent an email to Daniel, copying Defendant Alexander and explaining the need to record the arrangement through side letters so that HUD would not see the changes LRMC made:

**From:** Frank T. Sossi [mailto:ftsossi@bmdllc.com]
**Sent:** Monday, May 17, 2010 11:47 AM
**To:** Brad Daniel
**Cc:** Evan; Jim R; Edward Alexander; Frank T. Sossi
**Subject:** RE: Draft "Side Letter"

LRMC – Fees
RD Issues and Side Letter
May 17, 2010
==========================================

Brad:

Today is not good for calls on the Side Letter. We are scrambling to put together the $4m shortfall on funding, a replacement STARK Legal Opinion and have numerous other Closing Issues that need attention.

As to your comments - the basis of the Side Letter was to NOT amend either of the SDP Documents because those changes would need to roll though HUD PRIOR to the Initial Endorsement. As you are aware HUD has been nervous about this deal and would NOT react well to a change in the deal documents at this stage that increases fees to insiders. The structure as proposed was to allow for LRMC to add responsibilities to the Pre-Opening Agreement and fund those requirements though the issuance of Class B Convertible Bonds. Those bonds could either be held and converted after the accrued interest is paid or sold to new investors who want to come into the deal. The 50-50 split was based on Jeff's comment that he could take half of the fee as equity. The key to the plan is that there would be no additional need for cash to cover this addition to pre-opening services.

It is important to remember that the "pre-opening budget" is a cash requirement at closing for HUD. There is $6.6M in anticipated pre-opening costs in the $21M HUD required escrow funds – due at Closing. If we change a contract and increase pre-opening expenses we will increase the required reserve and go backwards on the cash needs.

The up to a Million was put in to allow the LRMC Board to dictate the level of the projects – as indicated in our calls there are several pending projects. As to timing of payments – again that would be a Board Issue. It is imperative that the Board actually be making these decisions or any challenge to the "arm-length" exception from limitations for payments to "insiders" could be lost. As set up the Side Letter is funded by New Notes – which should keep HUD out of the middle on this. The cash is provided by SDP in cooperation on this issue by taking up to $500k of cash payments that have been agreed to in notes so that the cash can be paid to RD.

124.    On May 18, 2010, Brad Daniel emailed Jeff Rush regarding the plan for LRMC to pay them in exchange for an additional investment (referencing Frank Sossi, Sam DeMaio, and

Eddie Alexander):

From:          Brad Daniel
Sent:          Tuesday, May 18, 2010 2:04 PM CDT
To:            Jeff
Subject:       Proposal


Jeff:


$1,500,000 Loan Proposal:

   1. Purchase $1.5m in Cash Surplus Notes at 15%

   2. $500,000 gets repaid immediately after closing. This represents $300k from Frank and $200k from Sam.

   3. This would leave a Cash Surplus Note of $1m in your name (Jeff Rush), earning 15%.

   4. You would receive a Fee of $400k, payable over 12 months. Frank mentioned that the $400k was initially offered based on holding $1.5m for a potential period of 24 months or longer, but it's now $1m. He thought maybe the $400k fee was a little high since $500k of $1.5m will be guaranteed to be repaid immediately after closing. Frank was not complaining (he only mentioned it).

   5. Your Cash Surplus Note of $1,000,000 would get purchased from the first cash surplus notes that LRMC sells and /or your $1m would be repaid and purchased from fees from RD Development Partners.

   6. We (RD), complete our Agreement for the $1m in additional fees for RD. RD will get $500k in Fees and $500k in Cash Surplus Notes. This is somewhat separate, but was already agreed to with Eddie. However, they now have to get it completed.

   Sam is in Agreement on the points.

Brad

     125.    In addition to constituting improper kickbacks, these transactions represent

additional impermissible borrowing by LRMC, both because (i) Rush and Daniel would not need

to hold the Surplus Cash Notes for more than two years, when Defendants previously had represented to HUD that the Surplus Cash Notes would not be paid until LRMC was operating profitably, and (ii) because LRMC promised a fixed fee amount for speculative promises of work.  The latter was specifically forbidden by the Regulatory Agreement, which required the payment of fair market value for work actually performed.  For example, Paragraph 9(b) of the Regulatory Agreement provides, "Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished."  Moreover, as described in greater detail below, a Rider to the Regulatory Agreement prohibited LRMC from making distributions to affiliates, including Rush and Daniel, unless the distributions were "arms-length transactions" for work performed for the mortgaged property or LRMC had Surplus Cash as defined by the Regulatory Agreement.

126.    On May 20, 2010, Jim Rohan of PMB wrote to Jeff Rush and Brad Daniel, recognizing the problematic nature of paying fees for unidentified work while LRMC's cash was restricted by the Regulatory Agreement with HUD.  He wrote:

| | |
|---|---|
| **From:** | Jim R |
| **Sent:** | Thursday, May 20, 2010 10:13 AM CDT |
| **To:** | Jeff |
| **CC:** | Brad Daniel |
| **Subject:** | FW: Side deal |

Jeff -

Please see my email below. The 12-month payback might create a problem not easy to solve. It suggests an awful lot of yet unidentified market-value work to be done in a fairly short period. 18-24 months, while delaying the payback (unless we actually can do that much work in 12 months), might buy additional flexibility in passing the market test with HUD.

Jim

iii.     LRMC Altered Its Investment Structure to Allow Loans to Non-Physicians.

127.    As noted above, LRMC's board also agreed to allow non-physicians to hold class B Surplus Cash Notes.  This represented a change from the structure previously disclosed to HUD in which only physicians who intended to practice at the hospital could hold Surplus Cash Notes.

128.    The Firm Commitment specifically required that any such changes be made only subject to the prior written approval of HUD:

**49. Changes of Ownership or Conversion of Surplus Cash Notes**

Mortgagor agrees that any changes in the ownership and offering documents of the Mortgagor, including any conversion of the Surplus Cash Notes from a debt to equity position, are subject to the prior written approval of HUD, which must be granted prior to the effective date of such any change to the ownership and offering documents.

The Firm Commitment further described the Surplus Cash Note holders as only "Former Class A & B Physicians" in the "Organizational Chart of Lakeway Regional Medical Center Showing

Included Property"

```
┌─────────────────────────────────────┐
│      FORMER CLASS A & B              │
│            Physicians                │
│         Surplus Cash Notes           │
│  Subordinated to any E Preference    │
│            And HUD Debt              │
│            $17,000,000               │
└─────────────────────────────────────┘
```

But, in order to conceal the cash shortfall from HUD, Defendants changed LRMC's

organizational structure after the Firm Commitment and a week before closing to allow non-

physicians to hold Surplus Cash Notes. This change was not communicated to HUD and LRMC

did not obtain the "prior written approval of HUD[.]"

129.    LRMC then proceeded to issue Surplus Cash Notes prior to initial endorsement to

non-physicians including Defendant SDP, Rush, Daniel, and Kendall Phinney.  Phinney was

involved in Aqualand Real Estate Services, LLC, which owned the land where LRMC planned to

place the hospital and was under contract to sell the land once the FHA-insured mortgage closed.

Defendants did not disclose to HUD that LRMC issued Surplus Cash Notes to non-physicians

and entities with an interest in LRMC's development.

iv.    Defendants Recognized That LRMC Did Not Have Sufficient "Cash to
Close."

130.    Immediately after closing, LRMC's internal documents acknowledged the cash

gap resulting from the borrowed funds used to close the loan.  On May 26, 2010, Defendant

Sossi wrote the following email to Defendants Alexander and Prater, among others,

acknowledging this cash gap:

**To:**      joel@starstateheart.com[joel@starstateheart.com]; Edward Alexander[ealexander@surgicaldevelopmentpartners.com];
Amanda L. Waesch[alwaesch@bmdllc.com]; Ed Bivins[bivinsee@surgicaldevelopmentpartners.com]
**Cc:**      Lisa Hoffpauir[lhoffpauir@surgicaldevelopmentpartners.com]; Jennifer
Kitchens[jkitchens@surgicaldevelopmentpartners.com];
jprater@surgicaldevelopmentpartners.com.[jprater@surgicaldevelopmentpartners.com.]; Frank T. Sossi@bmdllc.com]
**From:**    Frank T. Sossi
**Sent:**    2010-05-26T08:52:37-06:00
**Importance:**      Normal
**Subject:**   RE: Canfield Activity for LRMC
**Received:**         2010-05-26T08:52:40-06:00

LRMC – Canfield
May 26, 2010
========================================
Joel:
Add to the list:

    1.  Reconcile the requests for refunds so we have a definitive list of what needs to be returned.

    2.  We will need to work with the Jeff Rush and Sam DeMaio "redemption issues" on the priority of refunds and cash needs – we need to get the refunds done as a priority

    3.  Need to develop and share target lists and potential investors to fill the refund gap, the PMB project funding gap and the Jeff Rush take out amount for the last $1.5M

    4.  Please let me know progress on ED physicians and what the plan is for them

    5.  We need to determine which Side Letters are still effective and how to approach them

    6.  Need to determine physician gaps

    7.  Determine space for Cancer, EMS, administration.

Thanks,
Frank

This email recognized "the refund gap, the PMB project funding gap and the Jeff Rush take out amount for the last $1.5M[.]"  It also noted the "physician gaps" that existed after the initial closing.

    131.   On May 28, 2010, one week after closing, Joel Canfield sent an email to Defendant Sossi and other LRMC officers providing a reconciliation of monies owed to physicians for investment refunds. The reconciliation shows LRMC owed withdrawing physicians $1,845,552.88.

132.    A June 10, 2010 cash reconciliation of LRMC, shared as part of a Board conference call on that day and sent to a LRMC's leadership including Defendants Sossi, Alexander, and Prater, showed that LRMC was insolvent immediately after closing due to this borrowed money.

**Lakeway Regional Medical Center**
Reconciliation
June 10, 2010

Cash Balance June 10, 2010

| | | | |
|---|---|---|---|
| Cash, Operating Account | $ | 18,217.63 | |
| Cash, Escrow | | 50,651.25 | |
| Total Cash | | | $ 68,868.88 |
| | | | |
| **Refunds Due to Original Investors:** | | | |
| Reimbursement of Investment, Gambarin | $ | 250,000.00 | |
| Reimbursement of Investment, B&E Holdings | | 300,000.00 | |
| Reimbursement of Investment, Moroz | | 50,000.00 | |
| Reimbursement of Investment, Musculoskeletal Trust | | 100,000.00 | |
| Reimbursement of Investment, 620/CMS | | 400,000.00 | |
| Reimbursement of Investment, Reddy | | 33,000.00 | |
| Reimbursement of Investment, LRMC Investments | | 600,000.00 | |
| Reimbursement of Investment, Lakeway TX Investments | | 50,000.00 | |
| Due to Investors, at Close - Holdback Amounts, VonRueden | | 12,500.00 | |
| Due to Investors, at Close - Holdback Amounts, Frischhertz | | 10,052.88 | |
| Total Refunds Due to Original Investors: | | | $ 1,805,552.88 |
| | | | |
| **Fees to be Paid that are not in Budget:** | | | |
| PMB | $ | 500,000.00 | |
| Rush | | 400,000.00 | |
| | | | |
| Total Fees to be Paid that are not in Budget: | | | $ 900,000.00 |
| | | | |
| Variance Before Anticipated Reimbursements: | | | $ (2,636,684.00) |
| | | | |
| **Anticipated Reimbursements by June 30:** | | | |
| Draw #1 Initial Operating Capital | $ | 697,093.28 | |
| | | | |
| | | | $ 697,093.28 |
| | | | |
| Variance After Anticipated Reimbursements: | | | $ (1,939,590.72) |

133.    LRMC had an almost $2 million dollar shortfall, even after accounting for the money from the first draw on the FHA-insured loan.

     v.    <u>Defendants' Fraud Was Material to HUD's Decision to Insure the Loan.</u>

134.    As described above, Defendants knew that LRMC did not have sufficient cash to close and took active steps to hide that fact from HUD.

135. Defendants also knew that the amount of equity LRMC had at closing was important to HUD. Defendant Alexander was asked if "the overall size of the equity investment in Lakeway, was … important to HUD," and testified under oath that "the amount of equity, the amount of dollars from that perspective was always important."

136. Defendants did not share either with HUD or W&D that they used funds from investors who had canceled their investment to fund the cash equity or that immediately after closing LRMC had negative cash account balances.

137. Had W&D known, it would have informed HUD.

138. Had HUD known, it would not have allowed the loan to close and be endorsed for FHA insurance.

## IV. LRMC IMPROPERLY USED FUNDS RESTRICTED BY THE HUD REGULATORY AGREEMENT.

139. After the loan closed, Defendants ignored the restrictions placed by the HUD Regulatory Agreement meant to ensure HUD's interests were protected before investors received returns on their investment. LRMC instead paid equity investors and costs HUD specifically disallowed, all in violation of the Regulatory Agreement.

### A. LRMC Entered Into A Regulatory Agreement Restricting Its Use Of Funds.

140. In consideration of the mortgage insurance provided by HUD relating to the hospital, LRMC entered into a Regulatory Agreement dated May 21, 2010.

141. The Regulatory Agreement and its rider (Rider 1) broadly covered LRMC's assets, extending its coverage as follows:

> All current or future properties (which includes both personal property and real property) and revenues of Mortgagor on or off the Mortgaged Property, including accounts receivable derived from whatever source shall be considered part of the Mortgaged Property and subject to all provisions of the Regulatory Agreement[.]

Rider 1 Paragraph 20(a).

142.     The Regulatory Agreement required LRMC, as the owner, to comply with certain terms and conditions including, but not limited to, the following:

a)     Paragraph 6(b) of the agreement required that the owner shall not, without prior written approval from HUD, assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, other than from surplus cash (as defined in the agreement), except for reasonable operating expenses and necessary repairs.

b)     Paragraph 6(c) of the agreement required that the owners not, without prior written approval from HUD, convey, assign, or transfer any beneficial interest in any trust holding title to the property or any right to receive rents and profits from the mortgaged property.

c)     Paragraph 6(e) of the agreement required that the owners not, without prior written approval from HUD, make, or receive and retain, any distribution of assets or any income of any kind of the project except from, inter alia, surplus cash and non-borrowed funds if prior to the completion of the project.

d)     The agreement further stated: "This covenant does not permit a 'surplus cash' note without the-prior written permission of HUD.  A 'surplus cash' note is defined as a note that requires or permits principal repayments only when there is cash available by satisfying the conditions in Section 23(a)(l) through 23(a)(11) listed above."  Rider 1 Paragraph 23(d).

143.     LRMC had to satisfy each of the conditions in Sections 23(a)(1) through 23(a)(11) of the Regulatory Agreement before it could issue any distributions.  LRMC never

achieved all of the required conditions and so could never have make distributions without violating the Regulatory Agreement.  Those conditions included, inter alia:

(1) Final Endorsement of the HUD insured Deed of Trust Note (the "Note");
(2) Mortgage payments for the preceding 12 months were made when due, including any grace period;

Rider 1 Paragraph 23(a).

144.    The Regulatory Agreement placed limits on distributions to equity interest holders, Surplus Cash Note holders and affiliates including SDP, PMB, and RD Development.

145.    LRMC was prohibited by the Regulatory Agreement from making distributions to affiliates unless the distributions were "arms-length transactions" for work performed for the mortgaged property or LRMC had Surplus Cash as defined by the Regulatory Agreement. Pursuant to the Regulatory Agreement, an "arms-length transaction" is a transaction which meets one of the following conditions: (1) the cost of the services rendered is the lower of the market value or the fully allocated cost thereof, or (2) must have been equal to or less than the amount ordinarily paid for such work.  Rider 1, Paragraphs 22(c),(d).

146.    The Regulatory Agreement's definition of Surplus Cash contained numerous additional requirements to ensure a distribution did not leave LRMC with insufficient cash.

147.    The mortgage loan for LRMC received Initial Endorsement on May 21, 2010.

148.    The mortgage loan for LRMC received Final Endorsement on May 17, 2013.

149.    On October 3, 2013, W&D issued a Notice of Default to LRMC for LRMC's failure to make August, September, and October 2013 mortgage payments.

150.    LRMC was released from the Regulatory Agreement on January 12, 2015.

151.    At no point during the effective dates of the Regulatory Agreement—May 21, 2010 through January 12, 2015—did LRMC have Surplus Cash as defined in the Regulatory Agreement.

**B.    LRMC Violated The Regulatory Agreement, Federal Law, And Federal Regulations.**

152.    Defendants ignored LRMC's obligations under the Regulatory Agreement.  For example, Defendant Prater, LRMC's CFO, was responsible for ensuring LRMC's use of funds complied with the Regulatory Agreement.  Prater did not know what restrictions the Regulatory Agreement contained because, as he stated in sworn testimony, he never read it.

153.    Similarly, Defendant Sossi disregarded LRMC's obligations under the Regulatory Agreement when he suggested that the best course of action was to deceive HUD.  After HUD denied certain expenses, Sossi wrote "we may need to 'not fight' on some of the 2nd group unallowable items – and submit them later when the [HUD Client Service Team] is not looking at every number."  LRMC then paid, from mortgaged funds, the expenses that HUD had specifically denied.

154.    As described below, LRMC violated the Regulatory Agreement when it made distributions without satisfying the Regulatory Agreement's requirements.

        i.    <u>Payments to Equity Holders</u>

155.    Defendants paid money from LRMC's operating account to equity holders in the form of a refund of their investments.

156.    Between June 2010 and January 2011, Defendants made 14 payments from project assets to equity holders in violation of Paragraph 6 of the Regulatory Agreement.

157.    The 14 investor distribution payments total $2,060,729.58, and are more particularly identified in the below table:

| Amount | Description | Date |
|---|---|---|
| $250,000.00 | Refund of Investment Gambarin | 7/14/2010 |
| $300,000.00 | Refund of Investment, B&E Holdings | 7/14/2010 |
| $50,000.00 | Refund of Investment, Moroz | 7/14/2010 |
| $100,000.00 | Refund of Investment, Musculoskeletal Trust | 9/15/2010 |
| $155,176.70 | Refund of Investment, Mazursky via MCS Lake Business Project, LLC | 6/15/2010 |
| $100,000.00 | Refund of Investment, McCormick via MCS Lake Business Project, LLC | 7/20/2010 |
| $150,000.00 | Refund of Investment, Breed via MCS Lake Business Project, LLC | 7/20/2010 |
| $33,000.00 | Refund of Investment, Reddy | 7/14/2010 |
| $600,000.00 | Refund of Investment, LRMC Investments LLC | 6/30/2010 |
| $200,000.00 | Refund of Investment, LRMC Investments LLC | 7/8/2010 |
| $50,000.00 | Refund of Investment, Lakeway Texas Investments | 7/14/2010 |
| $12,500.00 | Refund of Investment - Holdback Portion, VonRueden | 7/14/2010 |
| $10,052.88 | Refund of Investment - Holdback Portion, Frischhertz | 7/14/2010 |
| $50,000.00 | Refund of Investment, RCMTA, LLC | 1/18/2011 |

158.    These payments represent the reimbursements to investors who sought to withdraw their investments prior to the May 2010 FHA insured mortgage closing (Initial Endorsement).  Defendants paid these reimbursements after Initial Endorsement, when the funds were restricted by the Regulatory Agreement.  Defendants failed to pay the reimbursements with HUD approval, with non-mortgaged funds, or with Surplus Cash, in violation of the Regulatory Agreement.

ii.        Payments to Affiliates

159.    Defendants also made 10 affiliate payments to Sossi; Rush; RD Development (referred to by its former name, RDK Development Partners, in the Regulatory Agreement); and Pacific Medical Buildings, in violation of Paragraph 6 of the Regulatory Agreement.

160.    Defendants paid money from LRMC's operating account to TFS Consulting for the benefit of Defendant Sossi.  The payment was for consulting services that were neither reasonable operating expenses nor represented arms-length transactions.

161.    Defendants paid TFS Consulting from LRMC's operating account and noted the payment in a draw request that LRMC submitted to HUD.  However, Defendants did not provide HUD with an explanation of the transaction or indicate the payment was to an affiliated party and not arms-length.

162.    Defendants did not disclose any other fees identified in paragraphs 163 through 167 to HUD.

163.    Defendants also paid money from LRMC's operating account to Jeff Rush Consulting for the benefit of Rush.  The payment was for consulting services that were neither reasonable operating expenses nor represented arms-length transactions.

164.    In addition, Defendants paid money from LRMC's operating account through SDP, the manager of the hospital, as a pass-through to RD Development, an investor and affiliate of LRMC, for management services that were neither reasonable operating expenses nor represented arms-length transactions.

165.    Defendants also paid money from LRMC's operating account through SDP, the manager of the hospital, as a pass through to RD Development and then to PMB, an investor and

affiliate of LRMC, for management services that were neither reasonable operating expenses nor represented an arms-length transaction.

166.    In part to cover these payments to PMB, LRMC amended its agreement with SDP to increase SDP's fee from $55,000 a month to $110,000 so that SDP could split its fees with PMB.  The First Addendum to the PPM specifically noted that the increased fee was "an inducement for the PMB Lakeway LLC contribution[.]"

> 7.    **SDP Pre-Opening and Management Services Agreement.**  The SDP Letter of Intent and Pre-Opening and Management Services Agreement (Tabs 6 and 7 of the original Offering) have been amended to allow an affiliate of PMB Lakeway LLC to share on a fifty-fifty basis the net Development Fee, that was to be an SDP fee, as an inducement for the PMB Lakeway LLC capital contribution to the Company. To compensate SDP for this accommodation, the date for the commencement of the SDP Pre-Opening fee has been set at September 1, 2008, the date of the initial First Closing. The SDP Pre-Opening Fee has been adjusted to One Hundred and Ten Thousand Dollars ($110,000) per month and the SDP Financing Fee has been reduced to three-quarters of one percent (0.75%) for the HUD financing (see attached PMB LOI and First Amendment to the Pre-Opening and Management Services Agreement).

When HUD questioned the amendment to the fee, LRMC did not disclose that the fee would be split with PMB, that PMB received the fee as an inducement for its investment, or whether PMB would perform any work.  Instead, Defendant Prater informed HUD that "the increase was based on the additional time and effort required for the re-structure and HUD funding."

167.    PMB recognized that the fees it received were a return on its equity investment rather than for work performed.  The letter of intent between PMB and SDP that memorializes the agreement to split SDP's fees makes clear that the fees were intended to increase the return on investment for PMB.  Immediately after closing, Rohan of PMB wrote to Daniel inquiring, "when we might expect to see some of the fees that should flow like a river out of the LRMC closing."

168.    The 9 non-arms length, affiliate payments total $1,858,500.00, and are more

particularly identified in the below table:

| Amount | Description | Date |
|---|---|---|
| $160,000.00 | TFS Consulting | 5/21/2010 |
| $38,500.00 | TFS Consulting | 10/27/2010 |
| $150,000.00 | Jeff Rush Consulting | 2/1/2011 |
| $100,000.00 | RD Development Partners, LLC Consulting – Jeff Rush Consulting | 11/30/2011 |
| $150,000.00 | RD Development Partners, LLC Final Jeff Rush Consulting Payment | 1/5/2012 |
| $1,080,000.00 | RD Development Partners, LLC – PMB | 7/15/2010 |
| $60,000.00 | RD Development Partners, LLC – PMB | 8/9/2010 |
| $60,000.00 | RD Development Partners, LLC – PMB | 9/7/2010 |
| $60,000.00 | RD Development Partners, LLC – PMB | 10/7/2010 |

iii.    Payment of Prohibited Lobbying Fees and Early Completion Bonuses

169.    Defendants used money from LRMC's operating account to pay Butera &

Andrews, a federal lobbyist, by passing funds through SDP.

170.    LRMC submitted a request to HUD to make this payment.  HUD rejected

LRMC's request. Notwithstanding that fact, Defendants made the payment by listing the expense

in a draw request on the FHA- insured loan, obscuring the payment as an account payable to

SDP.

171. Defendant Alexander, on behalf of LRMC, certified that LRMC would file a Standard Form-LLL before paying lobbying fees. LRMC never submitted this form.

---

### STATEMENT FOR LOAN GUARANTEES AND LOAN INSURANCE

The undersigned states, to the best of their knowledge and belief that:

If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress or an employee of a Member of Congress in connection with this commitment providing for the United States to insure or guaranty a loan, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

Submission of this statement is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, United States Code. Any person who fails to file the required statement shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Executed as of this 21st day of May, 2010.

#### MORTGAGOR:

**LAKEWAY REGIONAL MEDICAL CENTER, LLC**
a Texas limited liability company

By: _____
Samuel J. DeMaio, M.D.
Chairman of the Board

By: _____
G. Edward Alexander
Member and Manager

---

172. This payment was also made in violation of 31 U.S.C. § 1352(a), which prohibits the use of funds from a federal loan to pay for lobbying.

173. Defendants also paid money from LRMC's operating account to Hoar Construction for the payment of an early completion bonus.

174.   Defendants requested approval to pay the construction bonus. Robert Deen refused to give approval on behalf of HUD for the payment from mortgaged funds.  Once again, Defendants made the payments from mortgaged funds over HUD's express disapproval.

175.   The 4 prohibited payments to Butera & Andrews and Hoar Construction are identified below:

| Amount | Description | Date |
|---|---|---|
| $95,000.00 | Surgical Development Partners - Butera & Andrews 201005-LR | 2/18/2011 |
| $135,000.00 | Hoar Early Completion Bonus | 9/26/2012 |
| $19,583.00 | Hoar Early Completion Bonus | 11/7/2014 |
| $19,583.00 | Hoar Early Completion Bonus | 12/31/2014 |

## V.   LRMC DEFAULTED ON THE FHA-INSURED LOAN.

176.   On May 17, 2013, the mortgage received Final Endorsement from HUD.

177.   LRMC failed to make the required mortgage payments due August 1, 2013, September 1, 2013, and October 1, 2013.

178.   W&D issued a Notice of Default to LRMC on October 3, 2013, for LRMC's failure to make the August, September, and October 2013 mortgage payments.

179.   LRMC remained in default on the mortgage.

180.   On September 16, 2014, Greystone, the subsequent holder of the mortgage note, assigned the mortgage note to HUD.

181.   HUD paid a Partial Claim Settlement on September 17, 2014 of $154,602,965.89, which represents a portion of the outstanding principal and interest owed on the mortgage loan.

182.   Final Claim Settlement occurred on November 6, 2014.  LRMC's default on the mortgage loan caused HUD to pay an additional $18,363,981.49 to fully satisfy its obligation under the contract for insurance.

183.    HUD held an auction to see the mortgage note on December 14, 2014 and settled the sale on December 29, 2014.  The Note sold for $50,000,000.00.  HUD transferred the note on January 12, 2015 and released the Regulatory Agreement.

184.    Defendants signed tolling agreements that stated the following: "[T]he period of time between and including July 21, 2016 and November 1, 2017 shall be excluded when determining whether any civil or administrative claims are time-barred by statute of limitations, laches, or any other time-related defenses."

### COUNT I
### Violation of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(A)

185.    The United States repeats and realleges the allegations contained in Paragraphs 1 - 184 above, as if fully set forth herein.

186.    Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting or  causing to be presented to HUD false and/or fraudulent claims for payment.

187.    The United States paid the false and/or fraudulent claims because of Defendants' acts and incurred damages as a result.

### COUNT II
### Violation of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(B)

188.    The United States repeats and realleges the allegations contained in Paragraphs 1 – 184 above, as if fully set forth herein.

189.    Defendants violated the provisions of the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to a false or fraudulent claims for payment to HUD; and (ii) which claim the United States did pay.

190.     The United States paid the false or fraudulent claims because of Defendants' acts, and incurred damages as a result.

## COUNT III
### Violation of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(C)

191.     The United States repeats and realleges the allegations contained in Paragraphs 1 – 184 above, as if fully set forth herein.

192.     During the relevant time period, Defendants and their co-conspirators entered into one or more conspiracies to present or cause to be presented false or fraudulent claims for payment or approval to HUD and/or to make, use, or cause to be made or used false records or statements material to such claims.

193.     Defendants and their co-conspirators made or caused to be made such false claims, records or statements knowingly.

194.     As set forth in Paragraphs 1 - 184 above, Defendants and their co-conspirators performed acts in furtherance of these conspiracies.

195.     The United States sustained damages because of this wrongful conduct.

## COUNT IV
### Negligent Misrepresentation

196.     The United States repeats and realleges the allegations contained in Paragraphs 1 - 184 above, as if fully set forth herein.

197.     Defendants made representations to HUD on which it relied.

198.     As set forth above, Defendants supplied false information and made material omissions.

199.     Defendants did not exercise reasonable care in obtaining or communicating the information.

200.    As a result of justifiably relying on these representations, HUD incurred losses.

## COUNT V
### Violation of FIRREA,
### 12 U.S.C. § 1833a

201.    The United States repeats and realleges the allegations contained in Paragraphs 1 – 184 above, as if fully set forth herein.

202.    As set forth above, for the purpose of fraudulently obtaining the FHA mortgage insurance in violation of 12 U.S.C. § 1833a, the Defendants knowingly made, used, or caused to be made or used false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD/FHA in violation of 18 U.S.C. §§ 1006 and 1014 (as amended).

203.    Defendants (a) made statements to HUD with the intent to defraud or deceive HUD into providing mortgage insurance (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing FHA (18 U.S.C. § 1014, as amended).

204.    As a result Defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## COUNT VI
### Violation of 12 U.S.C. § l7l5z-4a

205.    The United States repeats and realleges the allegations contained in Paragraphs 1 – 184 above, as if fully set forth herein.

206.    LRMC owned a project with a mortgage insured by HUD under the National Housing Act.

207.    As the project owner, LRMC executed and was a party to a Regulatory Agreement pursuant to HUD's authority to regulate projects with FHA insurance.

208.    As set forth above, Defendants used assets and income in violation of the Regulatory Agreement.

209.    Based upon Defendants' use of project assets in violation of the Regulatory Agreement the United States is entitled to relief under 12 U.S.C. § l7l5z-4a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays for judgment against the Defendants as follows:

A.    As to Counts I, II and III under the FCA, 31 U.S.C. § 3729(a), treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law in the amount of $5,500 to $11,000 per violation of the FCA, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.    As to Count IV, compensatory damages in an amount to be determined at trial, plus costs and pre-and post-judgment interest;

C.    As to Count V, a statutory penalty under 12 U.S.C. § 1833a;

D.    As to Count VI, double damages; and

E.    Such other relief as the Court deems just and proper.

## JURY DEMAND

The United States demands a trial by jury as to all issues so triable.

Date:  September 25, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN F. BASH
United States Attorney

By:

THOMAS A. PARNHAM, JR.
Assistant United States Attorney
New York Bar No. 4775706
SUSAN STRAWN
Special Assistant United States Attorney
Texas Bar No. 19374330
903 San Jacinto Blvd, Suite 334
Austin, Texas  78701
Tel:  (512) 916-5858
Fax:  (512) 916-5854
Email:  thomas.parnham@usdoj.gov

ANDY J. MAO
SARA MCLEAN
SAMUEL J. BUFFONE
MICHAEL KASS
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
(202) 616-2945

*Attorneys for the United States of America*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Lakeway Regional Medical Center, LLC, Surgical Development Partners, LLC, SDP of Austin Enterprises, LLC, G. Edward Alexander, Frank Sossi, and John Prater |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Travis**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas A. Parnham, Jr., United States Attorney's Office, 903 San Jacinto Blvd, Suite 334, Austin, Texas 78701, Tel: 512-916-5858

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability — ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander — Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability — Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine — ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability — **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle — ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability — ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury — ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice — ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights — **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting — ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment — ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations — ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment — ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other — **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education — ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729; 12 U.S.C. § 1833a; 12 U.S.C. § 1715z-4a

Brief description of cause:
False Claims Act; Negligent Misrepresentation; FIRREA; Double Damages Remedy

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
09/25/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Thomas A. Parnham, Jr.

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.